AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

AUG **3 0** 2019

MITCHELL R. ELFERS
CLERK

*19mr1039*

# UNITED STATES DISTRICT COURT
### for the
### District of New Mexico

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. |
| | ) | |
| 7 Josephine Road; | ) | |
| Santa Fe, NM 87508 | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see attachment A

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution and Possession with Intent to Distribute Controlled Substances |
| 21 U.S.C. § 846 | Conspiracy |

The application is based on these facts:

The affidavit of Special Agent Jason Jones is incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jason P. Jones, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____08/29/2019_____

_____
*Judge's signature*

City and state: Albuquerque, New Mexico

Steven C. Yarbrough, United States Magistrate
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:
7 JOSEPHINE ROAD; SANTA FE, NM 87508

Case No. _____

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jason P. Jones, Special Agent of the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent for the DEA, United States Department of Justice. Prior to becoming a Special Agent, I was a police officer with the Metropolitan Police Department in Washington, DC for five years. I have been a Special Agent with DEA since 2018. As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for criminal offenses, to include those enumerated in 18 U.S.C. § 2516.

2.      As a Metropolitan Police officer, my duties included being a patrol officer, enforcing the District of Columbia traffic laws and regulations. Later, I was assigned to the Gun Recovery Unit, conducting investigation on the illegal purchase and carrying off firearms. My experience as a Special Agent ("SA") includes, but is not limited to, conducting surveillance, writing affidavits for and executing search warrants, and working with undercover agents and

1

informants. I have received training and have experience in the investigation of violations of the federal drug and money laundering laws, including the offenses listed below. I have participated in the investigation of drug trafficking conspiracies, including participation in Title III investigations. As a result, I am, and agents assisting in this investigation are, familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs and to hide profits generated from those transactions. I also have experience in interpreting and analyzing drug codes and cryptic dialogue used by drug traffickers. I am aware that DTOs are concerned about the efforts law enforcement makes to disrupt and dismantle their activities.

3.      I am involved in an investigation regarding the distribution of illegal drugs, specifically cocaine, by Francisco DIAZ (hereafter referred to as "DIAZ"). Since the investigation's inception, I, along with other Special Agents with DEA, and Region III Narcotics Task Force have obtained information regarding the illegal drug trafficking activities of DIAZ and others.

4.      A Confidential Source (CS) has also yielded information indicating that DIAZ stores and distributes cocaine from his residence, located at 7 Josephine Road; Santa Fe, New Mexico 87508, (hereafter referred to as the "TARGET PREMISES"). I am submitting this Affidavit in support of an application for a warrant to search the premises (further described in Attachment A) for evidence, contraband, and fruits and instrumentalities of violations of Title 21, United States Code, Section 841 (further described in Attachment B).

5.      I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents that have participated in the investigation. I have developed information I believe to be reliable from additional sources including:

    a.   Information provided by SAs and Intelligence Research Specialists ("IRS") of the DEA, including oral and written reports that I have received directly or indirectly from said investigators;

    b.   Results of physical surveillance conducted by agents during the investigation;

    c.   A review of driver's license and automobile registration records;

    d.   Records from the National Crime Information Center ("NCIC").

6.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search a certain premises, identified as the TARGET PREMISES, as more particularly described in Attachment A. This affidavit does not set forth all my knowledge about this matter. This affidavit is intended to show only that there is probable cause for the requested search warrant. Additionally, agents expect that the TARGET PREMISES has been used, and continues to be used, by DIAZ.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

7.      I believe there is probable cause that DIAZ has committed, is committing, and will continue to commit offenses involving violations of, *inter alia*:

    a.   21 U.S.C. § 846 – Conspiracy to distribute, and possess with intent to distribute, controlled substances;

3

b. 21 U.S.C. § 841 – Distribution of controlled substances and possession with intent to distribute controlled substance.

## EVIDENCE SOUGHT DURING SEARCH

8.      Based on my training, experience and participation in this, and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide evidence from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence may also be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, in safes, or buried underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes paraphernalia for weighing, packaging, and distributing drugs, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

9.      Based on my training and experience, I also know that individuals involved in drug trafficking often make use of "stash houses." These stash houses (or apartments) are often residences owned, rented, or controlled by drug traffickers that are separate from the residences where the drug traffickers live on a daily basis. The stash house is used by the drug trafficker to store and package controlled substances and the proceeds of drug trafficking. Stash houses are often owned or rented under aliases in effort to avoid law enforcement detection. By using a

4

stash house, a drug trafficker attempts to create distance between himself/herself and the controlled substances kept at the stash house, in the event that the stash house is detected by law enforcement.

10.     Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

11.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

12.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers

of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

13.     Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, and passports and visas and their contents. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other media.

14.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

15.      Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

16.      Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

17.      Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by: (a) placing assets in names other than their own to avoid detection while maintaining control; (b) laundering money through what appears to be a legitimate business or businesses; (c) hiding the money in their homes, safes and safety deposit boxes, and/or; (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and

7

personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

18.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but can also be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and cars.

19.     The use of smartphones, tablets, cellular phones, and digital devices has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia

8

Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

20.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

21.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

22.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

23.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents), evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital pagers (and their contents) cellular/mobile telephones (and their contents), and counter-surveillance devices.

24.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the TARGET PREMISES, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

25.     A list of items agents seek authority to seize and search is in Attachment B.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

26.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the TARGET PREMISES, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers and other storage media such as a computer hard drives, external hard drives, thumb drives, secure digital cards and other types of flash memory cards, compact disks and floppy disks, personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. For this reason, I submit that if a computer or storage medium is found on the TARGET PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

27.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

11

on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

   a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

   b.   Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

     c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

28.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant

## PROBABLE CAUSE

29.    As a result of my personal participation in the investigation of DIAZ, I am familiar with the facts and circumstances of the offenses described in this Affidavit. When I assert that a statement was made, I have either direct knowledge of the statement, or the information was provided by another law enforcement agent (who may have had either direct or hearsay knowledge of the statement), and I have either spoken to the agent or have read and reviewed the agent's report.

30.    As described below in detail, DIAZ unlawfully distributes cocaine, in Santa Fe, New Mexico. Some of this information has been relayed to me from conversations with other

agents, and has been corroborated through my investigative efforts. The following is a summary

of the investigation to this point.

## **Confidential Source Purchase #1**

31.     A Region III Narcotics Task Force Confidential Source ("CS")[1] has been in

contact with Francisco DIAZ, a known drug trafficker in the Santa Fe, NM area. At the direction

of law enforcement, the CS has arranged several controlled purchases.

32.     On June 17, 2019, the CS sent a text message to DIAZ to inquire about

purchasing illegal drugs. DIAZ replied and told the CS to come to the TARGET PREMISES.

33.     Agents with the Albuquerque District Office Tactical Diversion Squad and

Region III Narcotics Task Force established surveillance in the area of the TARGET PREMISES

in anticipation of a buy/walk operation between the CS and DIAZ.

34.     Prior to the buy/walk, agents met with the CS at a predetermined location. Agents

searched the CS and the CS' vehicle for contraband before the drug transaction with DIAZ. No

contraband was located. Agents gave the CS $1,300 in Official Advanced Funds ("OAF") to

purchase one (1) ounce of cocaine from DIAZ. Agents gave the CS a recording device to

---

[1] The CS has been deemed reliable by agents. The CS is a known associate of DIAZ and has been for approximately two years.  The CS has pending charges and is working in exchange for consideration as to those charges.  The CS has previously provided information to agents that has been corroborated through independent means. The CS has never provided information to agents that was later found to be false. The CS has previously conducted controlled purchases under the supervision of agents.

monitor the conversation between the CS and DIAZ. The recording was placed in DEA non-drug evidence for safekeeping.

35.     Agents then followed the CS to the area of the TARGET PREMISES. Due to the fact of where the TARGET PREMISES is located and the CS' knowledge of DIAZ's suspicious nature, agents were only able to follow the CS to Josephine Road.

36.     Following the drug transaction, agents followed the CS back to the predetermined met location. Agents searched the CS and the CS' vehicle for contraband after the drug transaction with DIAZ. No contraband was located.

37.     Agents interviewed the CS following the drug transaction. The CS stated that she/he drove into the property of TARGET PREMISES and parked. The CS stated DIAZ got into the CS' vehicle. The CS stated she/he gave DIAZ $1,300 and DIAZ gave the CS one (1) baggy of cocaine.

38.     The CS turned over one (1) baggy of a white powdery substance to agents. Using a TruNarc, the white powdery substance field tested positive for cocaine HCL and had a weight of 57.9 gross grams.

39.     Agents sent the drug exhibit to the DEA South Central Laboratory for analysis and safekeeping. DEA laboratory results identified the substance as Cocaine Hydrochloride.

**Confidential Source Purchase #2**

40.     In July 2, 2019, the CS sent a text message to DIAZ to inquire about purchasing cocaine. DIAZ replied and told the CS to come to the TARGET PREMISES.

15

41.     Agents with the Albuquerque District Office Tactical Diversion Squad and Region III Narcotics Task Force established surveillance in the area of the TARGET PREMISES, in anticipation of a buy/walk operation between the CS and DIAZ.

42.     Prior to the buy/walk, agents met with the CS at a predetermined location. Agents searched the CS and the CS' vehicle for contraband before the drug transaction with DIAZ. No contraband was located. Agents gave the CS $2,600 in Official Advanced Funds (OAF) to purchase two (2) ounce of cocaine from DIAZ. Agents gave the CS a recording device to monitor the conversation between the CS and DIAZ. The recording was placed in DEA non-drug evidence for safekeeping.

43.     Agents then followed the CS to Josephine Road. Due to the fact of where the TARGET PREMISES is located and the CS' knowledge of DIAZ's suspicious nature, agents were only able to follow the CS to Josephine Road.

44.     Following the drug transaction, agents followed the CS back to the predetermined met location. Agents searched the CS and the CS' vehicle for contraband after the drug transaction with DIAZ. No contraband was located.

45.     Agents interviewed the CS following the drug transaction. The CS stated that she/he drove into the property of TARGET PREMISES and parked. The CS stated DIAZ got into the CS' vehicle. The CS stated she/he gave DIAZ $2,600 and DIAZ gave the CS one (1) baggy of cocaine. The CS stated that she/he told DIAZ she/he was supposed to be getting two (2) ounces. The CS stated that DIAZ exited the CS' vehicle went inside the TARGET PREMISES and DIAZ came back out with another one (1) baggy of cocaine.

46.     The CS turned over two (2) baggies of a white powdery substance to agents. Using a TruNarc, the white powdery substance field tested positive for cocaine HCL and had a weight of 87.3 gross grams.

47.     Agents sent the drug exhibit to the DEA South Central Laboratory for analysis and safekeeping. DEA laboratory results identified the substance as Cocaine Hydrochloride.

## Confidential Source Purchase #3

48.     On July 29, 2019, the CS sent a text message to DIAZ to inquire about purchasing cocaine. DIAZ replied and told the CS to come to the TARGET PREMISES.

49.     Agents with the Albuquerque District Office Tactical Diversion Squad and Region III Narcotics Task Force established surveillance in the area of the TARGET PREMISES, in anticipation of a buy/walk operation between the CS and DIAZ.

50.     Prior to the buy/walk, agents met with the CS at a predetermined location. Agents searched the CS and the CS' vehicle for contraband before the drug transaction with DIAZ. No contraband was located. Agents gave the CS $2,600 in Official Advanced Funds (OAF) to purchase two (2) ounce of cocaine from DIAZ. Agents gave the CS a recording device to monitor the conversation between the CS and DIAZ. The recording was placed in DEA non-drug evidence for safekeeping. Agents also placed a GPS tracking device into the CS' vehicle to track the CS' location.

51.     Agents then followed the CS to the area of the TARGET PREMISES until the CS turned onto Josephine Road. Agents then used the GPS tracking device to verify the CS arrived at the TARGET PREMISE.

52.     Following the drug transaction, agents followed the CS back to the predetermined met location. Agents searched the CS and the CS' vehicle for contraband after the illegal drug transaction with DIAZ. No contraband was located.

53.     Agents interviewed the CS following the drug transaction. The CS stated that she/he drove into the property of TARGET PREMISES and parked. The CS stated DIAZ got into the CS' vehicle. The CS stated she/he gave DIAZ $2,600 and DIAZ gave the CS one (1) baggy of cocaine.

54.     The CS turned over one (1) baggy of a white powdery substance to agents. Using a TruNarc, the white powdery substance field tested positive for cocaine HCL and had a weight of 82.8 gross grams.

55.     Agents sent the drug exhibit to the DEA South Central Laboratory for analysis and safekeeping. The results for this drug exhibit are currently pending.

### Confidential Source Purchase #4

56.     On August 26, 2019, the CS sent a text message to DIAZ to inquire about purchasing cocaine. DIAZ replied and told the CS to come to the TARGET PREMISES.

57.     Agents with the Albuquerque District Office Tactical Diversion Squad and Region III Narcotics Task Force established surveillance in the area of the TARGET PREMISES, in anticipation of a buy/walk operation between the CS and DIAZ.

58.     Prior to the buy/walk, agents met with the CS at a predetermined location. Agents searched the CS and the CS' vehicle for contraband before the drug transaction with DIAZ. No contraband was located. Agents gave the CS $2,600 in Official Advanced Funds (OAF) to purchase two (2) ounce of cocaine from DIAZ. Agents gave the CS a recording device to monitor the conversation between the CS and DIAZ. The recording was placed in DEA non-drug evidence for safekeeping. Agents also placed a GPS tracking device into the CS' vehicle to track the CS' location.

59.     Agents then followed the CS to the area of the TARGET PREMISES until the CS turned onto Josephine Road. Agents then used the GPS tracking device to verify the CS arrived at the TARGET PREMISE.

60.     Following the drug transaction, agents followed the CS back to the predetermined met location. Agents searched the CS and the CS' vehicle for contraband after the illegal drug transaction with DIAZ. No contraband was located.

61.     Agents interviewed the CS following the drug transaction. The CS stated that she/he drove into the property of TARGET PREMISES and parked. The CS stated DIAZ got into the CS' vehicle. The CS stated she/he gave DIAZ $2,600 and DIAZ gave the CS two (2) baggies of cocaine.

19

62.    The CS turned over two (2) baggies of a white powdery substance to agents. The drug exhibit had a weight of 87.6 gross grams and was sent to the DEA South Central Laboratory for analysis and safekeeping. The results for this drug exhibit are currently pending.

63.    For the reasons stated above, I believe there is probable cause to search the TARGET PREMISES for the items listed in Attachment B.

## CONCLUSION

1.    Based upon the information provided in this affidavit, I believe the items to be seized, which are described in Attachment B for the property to be searched (Attachment A), will constitute admissible evidence of the violations outlined in this affidavit.

I swear that this information is true and correct to the best of my knowledge and belief.

JASON P. JONES
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
This 29th day of August, 2019.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE

20

## ATTACHMENT A

## PREMISE TO BE SEARCHED (TARGET PREMISES)

### 7 Josephine Road, Santa Fe, NM 87508

The TARGET PREMISES is a residential property located at 7 Josephine Road, Santa Fe, NM 87508. The TARGET PREMISES is entirely surrounded by a brick wall approximately eight (8) feet tall. There are two gates that open and close that grant vehicular access to the TARGET PREMISES. The home appears to be a single store with white vinyl siding. The front of the property is facing south.

To include all vehicles, trailers and appurtenances on the property within the curtilage of the property.

Below is an aerial photograph of the TARGET PREMISES.



21

## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. §§ 841, 846, and 860, and 18 U.S.C § 2, including:

1. Controlled substances, including, methamphetamine, fentanyl, oxycodone, heroin, cocaine, and marijuana.

2. Drug paraphernalia, including, scales, packaging materials, items for packaging and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions. *scy*

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking associates.

8. Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including, utility bills, cancelled checks, or envelopes and deeds or leases.

9. Indications of ownership or control over any vehicles located at the place to be searched, including, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys,

safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including handguns, rifles, shotguns and automatic weapons will be seized if illegal narcotics are found and/or if they are being possessed by a prohibited person.

16. Property constituting evidence of the commission of the criminal offenses of 21 U.S.C. §§ 841, 846, and 860, and 18 U.S.C § 2, contraband, and property designed and intended for use as the means for committing the criminal offenses of 21 U.S.C. §§ 841, 846, and 860, and 18 U.S.C § 2, as well as paraphernalia used to prepare controlled substances for distribution and personal use.

17. Any and all computers and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

23

The terms "storage medium" or "storage media" include any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.